Opinion issued May 1, 2008 

 

 












In The

Court of Appeals

For The

First District of Texas

____________


NO. 01-06-01079-CR

____________


JESSE LOPEZ, JR., Appellant


V.


THE STATE OF TEXAS, Appellee






On Appeal from the 262nd District Court

Harris County, Texas

Trial Court Cause No. 1035412






MEMORANDUM OPINION A jury convicted appellant, Jesse Lopez, Jr., of capital murder. The trial court
assessed appellant's punishment at life imprisonment, which is the only possible
sentence because the State did not seek the death penalty. See Tex. Pen. Code Ann.
§§12.31 (Vernon 2003), 19.03 (Vernon Supp. 2007). 

 In thirteen points of error, appellant contends that: (1) the evidence is legally
insufficient to sustain the verdict finding appellant guilty of capital murder, (2) the
evidence is factually insufficient to sustain the verdict finding appellant guilty of
capital murder, (3) the trial court erred when it allowed the State to introduce
evidence of certain extraneous acts, (4) the trial court erred when it allowed the State
to cross-examine appellant about these extraneous acts, (5) the trial court erred when
it denied appellant's motion for a mistrial based on an improper question posed by the
State to a defense witness, (6) the trial court erred when it allowed the State to
introduce a photograph of appellant in possession of a gun on a date not alleged in
the indictment, (7) the trial court erred when it excluded certain evidence regarding
the presence of controlled substances in the bodies of the complainants, (8) the trial
court erred when it refused to allow the introduction of autopsy photographs of one
complainant, (9) the trial court erred when it refused to allow testimony regarding the
meaning of one complainant's tattoo, (10) the trial court erred when it refused to
submit a "sudden passion" charge to the jury during the guilt-innocence phase of the
trial, (11) the trial court erred when it refused appellant's requested jury instruction
on the right to continue shooting, (12) the trial court erred when it overruled
appellant's objection to the prosecutor's argument concerning the relevance of the
second shooting to the appellant's state of mind during the first shooting, (13) the
trial court erred when it overruled appellant's objection to the prosecutor's argument
concerning the application of the law of self-defense.

 We affirm.

I. Factual Background

 Appellant, Jesse Lopez, was convicted for the murder of the complainants
following an altercation outside Poppa Burger, a small 24-hour Houston roadside
restaurant with outdoor picnic table seating. The incident began in the midnight
hours of Saturday, April 2, 2005, when four couples arrived at the restaurant to order
food. The group drove to Poppa Burger in two cars following an evening of drinking
beer and other alcohol. The following individuals arrived at Poppa Burger: (1)
appellant; (2) appellant's common-law wife, Erica Diaz ("Erica"); (3) appellant's
uncle Jimmy Lopez ("Jimmy"); (4) Jimmy's common-law wife Guadalupe Cardenas;
(5) Anthony Hinojosa ("Anthony"); (6) Lisa Hinojosa ("Lisa"); (7) appellant's step-sister Alexandria Stone ("Alex"); (8) Alex's husband Hugo Sanchez ("Hugo"). 

 Two Poppa Burger employees, Martha Sisco and Yamileth Reyes, were
working when they saw the cars park next to a vacant warehouse near the restaurant. 
Both testified that they noticed the group because of the loud music coming from
their cars. As appellant walked up the ramp to the ordering line, his shirt lifted and
Sisco saw a gun in his waistband. Sisco testified that the gun made her nervous.

 Six members of the group, including appellant, ordered food and ate it at a
picnic table near the ordering window. The other two individuals, Alex and Hugo,
remained in a car. As the group ate their meal, regular customers Rudy Villanueva
and Modesta Pena ("the complainants") rode up on their bicycles and parked. 
Villanueva began walking up the ramp to order food from the attendant at the
window. Before Villanueva could reach the window, Jimmy knocked both
complainant's bikes over on the way to the bathroom. Jimmy apologized, picked up
the bikes, and continued around the restaurant's exterior to use the restroom.

 Before the altercation started that led to the shooting, the facts are generally
agreed upon. However, what happened between this point and the deaths of the
complainants, as well as the reasons for the shootings, were in dispute at appellant's
trial. We present both versions.

 A. State's Evidence

 Villanueva was upset that the bikes had been knocked over and began
mumbling and cursing. At some point, appellant left his table and confronted
Villanueva. Scared, Sisco left her work station and went to go hide in the restaurant's
walk-in freezer. 

 Reyes testified that she saw appellant push Villanueva and that a fist-fight
ensued. Lisa and Jimmy both testified that Villanueva was the first aggressor. 
Anthony joined the fray on appellant's behalf. Pena tried to approach the fight in
order to defend Villanueva and separate the combatants, but the women in appellant's
group stopped her. Three of the women hit Pena, pulled her hair, threw a drink on
her, and kicked her until she fell to the ground with the women on top of her. All
three women were quite a bit larger than Pena. 

 While the women were hitting Pena, appellant was on top of and fighting
Villanueva with Anthony's help. Jimmy heard the struggle from behind the building,
returned to the area, and punched Villanueva in the face, causing Villanueva to fall
to the ground. At that point, Anthony moved away from Villanueva, while Jimmy
positioned himself between appellant and Villaneuva. Jimmy then told Villanueva
that they did not want any problems. Appellant leaned around Jimmy and shot
Villanueva eight times with his 9-millimeter handgun while Villanueva was prostrate
on the ground.

 The women fighting Pena heard the gunshots and all but Erica got off Pena and
fled to their vehicles. Jimmy and Anthony returned to the vehicles as well. Appellant
walked over, pulled Erica off of Pena, and pointed the gun at Pena as she lay on the
ground. The medical testimony revealed that Pena was injured, curled up in a
defensive position, and trying to scoot back away from appellant when she was shot. 
Lisa testified that appellant fired his remaining eight bullets into her as he walked to
his vehicle. Appellant and his friends then drove away.

 Officers found Pena dead at the scene with some money and a disposable
lighter still in her hand. A bicycle chain and lock was lying next to her body. 
Villanueva was found alive and was transported to the hospital by EMS, where he
later died. At the scene of the incident, officers recovered 16 fired 9-millimeter
cartridge casings from the area where the victims were shot, along with a cellular
phone. 

 Autopsies confirmed that Villanueva and Pena were each shot eight times and
died from their injuries. Each also suffered significant head trauma. A firearms
examiner confirmed that two bullets taken from Villanueva's body, two bullets taken
from Pena's body, and the 16 fired 9-millimeter cartridge casings found near the
shooting site were all fired or ejected from the same gun. 

 Shortly after the shooting, appellant told Jimmy that he killed Pena because he
did not want to leave a witness. He also said that he had dropped his cell phone at the
restaurant. Appellant devised a plan to have his mother report the cell phone stolen,
however, officers eventually recovered the cell phone and established appellant's
ownership by utilizing the phone numbers stored on the phone. As a result, officers
were able to present Sisco and Reyes with photospreads containing appellant's
picture in order to determine whether either or both Poppa Burger employees could
place appellant at the scene of the shooting. 

 Reyes positively identified appellant as the man with a gun at Poppa Burger the
night of the shooting, while Sisco said appellant looked like the man. At trial, both
Reyes and Sisco positively identified appellant as the man with the gun at Poppa
Burger the night of the murders. Both Lisa and Jimmy unequivocally identified
appellant as the shooter. 

 B. Appellant's Evidence

 Appellant testified that Villanueva was intoxicated, angry and cursing him and
Jimmy after Jimmy knocked over Villanueva's bike. Jimmy apologized, after which
Villanueva walked up and hit appellant in the face. The blow knocked appellant to
the ground and Villanueva landed on top of him. Pena, who appellant testified also
seemed intoxicated, ran over and also started hitting appellant. 

 During the struggle, Villanueva started grabbing for appellant's gun and both
men fought over it. The gun went off one time. Jimmy separated the men and
appellant retained control of the gun. Appellant testified that just after they were
separated and the confrontation ended, appellant shot Villanueva because he felt
scared of him and thought he had no other choice.

 Appellant stated that after shooting Villanueva, he saw Pena hitting Erica with
the bike chain and ran over to intervene. Erica managed to get the chain away from
Pena, and she fell backwards. Erica then ran away to the vehicle. As appellant drew
near, Pena reached up and grabbed appellant's arm. Appellant yanked his arm away
and Pena fell backwards again. Appellant then started shooting his gun at Pena as he
ran to the vehicle. 

II. Discussion

A. Sufficiency of the Evidence

 In his first and second points of error, appellant asserts that the evidence is
legally and factually insufficient to support the verdict that he committed capital
murder and did not act in self-defense. 

 1. Standard of Review

 a. Legal Sufficiency

 When an appellant challenges both the legal and factual sufficiency of the
evidence, we must first determine whether the evidence was legally sufficient to
support the verdict. Harmond v. State, 960 S.W.2d 404, 406 (Tex. App.--Houston
[1st Dist.] 1998, no pet.). When examining the legal sufficiency of the evidence,
appellate courts view the evidence in the light most favorable to the verdict to
determine whether any rational trier of fact could have found the essential elements
of the crime beyond a reasonable doubt. Poindexter v. State, 153 S.W.3d 402, 405
(Tex. Crim. App. 2005) (citing Jackson v. Virginia, 443 U.S. 307, 318-19, 99 S. Ct.
2781, 2788-2789 (1979)). This standard concedes to appellate courts only a limited
role. The inquiry does not require a reviewing court to ask itself whether it believes
that the evidence at the trial established guilt beyond a reasonable doubt. Jackson,
443 U.S. at 318-19, 99 S. Ct. at 2789. In this regard, the court is not to position itself
as a thirteenth juror in assessing the evidence. Narvaiz v. State, 840 S.W.2d 415, 423
(Tex. Crim. App. 1992) (stressing that appellate judges are not factfinders); Moreno
v. State, 755 S.W.2d 866, 867 (Tex. Crim. App. 1988). Rather, the court is to
position itself as a final, due process safeguard, ensuring only the rationality of the
factfinder. Moreno, 755 S.W.2d at 867. The factfinder's verdict must stand unless
it is found to be irrational or unsupported by more than a "mere modicum" of the
evidence, with such evidence being viewed under the Jackson light. Id.

 b. Factual Sufficiency

 When conducting a factual sufficiency review, we view all of the evidence in
a neutral light. Cain v. State, 958 S.W.2d 404, 408 (Tex. Crim. App. 1997). There
are two prongs to a factual sufficiency analysis. First, we must ask whether the
evidence introduced to support the verdict, although legally sufficient, is so weak that
jury's verdict seems clearly wrong and manifestly unjust. Watson v. State, 204
S.W.3d 404, 414-15 (Tex. Crim. App. 2006) (quoting Johnson, 23 S.W.3d at 11). 
Second, we must ask whether, considering any conflicting evidence, the jury's
verdict, although legally sufficient, is nevertheless against the great weight and
preponderance of the evidence. Id. at 415. 

 During the course of the analysis, we are mindful that we must give appropriate
deference to the jury findings in order to prevent intruding on the factfinder's role as
the sole judge of the weight and credibility of the evidence. See Marshall v. State,
210 S.W.3d 618, 625 (Tex. Crim. App. 2006); Johnson, 23 S.W.3d at 7. Therefore,
unless the record clearly reveals a different result is appropriate we must defer to the
jury's determination concerning what weight to give contradictory testimonial
evidence because resolution often turns on an evaluation of credibility and demeanor. 
See Marshall, 210 S.W.3d at 625. In other words, as the determiner of the credibility
of the witnesses, the jury may choose to believe all, some, or none of the testimony
presented. Cain, 958 S.W.2d at 407 n.5. In our review, we must also discuss the
evidence that, according to appellant, most undermines the jury's verdict. See Sims
v. State, 99 S.W.3d 600, 603 (Tex. Crim. App. 2003). 

 2. Self-Defense

 In his first and second issues, appellant argues that the evidence is legally and
factually insufficient to support appellant's conviction for capital murder and the
jury's implicit rejection of appellant's self-defense claim.

 A person commits the offense of capital murder if he or she intentionally or
knowingly causes the death of an individual or intends to cause serious bodily injury
and commits an act clearly dangerous to human life that causes the death of an
individual, and the person murders more than one person during the same criminal
transaction. Tex. Pen. Code Ann. §§ 19.02(b)(1) (Vernon 2003), 19.03(a)(7)(A)
(Vernon Supp. 2007). However, a person is generally justified in using deadly force
against another if he reasonably believes that deadly force was necessary to protect
himself against the other's use or attempted use of unlawful deadly force and a
reasonable person in the actor's situation would not have retreated. Tex. Pen. Code
Ann. §§9.31(a), 9.32(a) (Vernon Supp. 2007). (1) A defendant has the burden of
producing some evidence to support a claim of self-defense. Zuliani v. State, 97
S.W.3d 589, 594 (Tex. Crim. App. 2003). Once the defendant produces some
evidence, the State then bears the burden of persuasion to disprove the raised defense. 
Id. The burden of persuasion does not require the State to produce evidence; it
requires only that the State prove its case beyond a reasonable doubt. Id.

 A determination of guilt by the fact-finder implies a finding against the
defensive theory. Id. Thus, to convict a defendant of murder after he has raised the
issue of self-defense, the State is required to prove the elements of the offense beyond
a reasonable doubt and to persuade the jury beyond a reasonable doubt that the
defendant did not kill in self-defense. See id. Self-defense is a fact issue to be
determined by the jury, which is free to accept or reject the defensive issue. Saxton
v. State, 804 S.W.2d 910, 913-14 (Tex. Crim. App. 1991).

 3. Analysis

 We begin by discussing the evidence that appellant contends supports his claim
of self-defense and undermines the jury's verdict. At trial, appellant claimed that he
justifiably killed Villanueva and Pena in self-defense. Appellant also suggested that
he killed Pena in defense of Erica, who is referred to throughout the testimony as
appellant's girlfriend or common law wife.

 The State produced evidence suggesting that appellant was the aggressor
towards Villanueva. According to Erica, appellant and Anthony began fighting
Villanueva, but Jimmy broke up the fight by striking Villanueva in the face and
causing him to fall down. The State's theory was that Villanueva presented no
immediate danger; he was "down" and not trying to get back on his feet. In support
of this, Erica testified that, at that moment, everyone could have walked away and
nobody had to die. 

 The testimony also revealed that, having shot Villanueva eight times as he lay
on his back, appellant turned to the struggle between Diaz and Pena. The medical
testimony showed Pena had been beaten badly and was lying on the ground with her
legs curled up. Jimmy testified that Pena was trying to back away from appellant
when he shot her "execution style" at point blank range, eight times. 

 The jury was free to believe the evidence that neither Villanueva nor Pena was
attempting to use unlawful deadly force against appellant or force sufficient to cause
serious bodily injury (2) when appellant shot them, despite the existence of contrary
testimony from appellant. See Muniz v. State, 851 S.W.2d 238, 246 (Tex. Crim. App.
1993). Therefore, viewing the evidence in the light most favorable to the verdict, we
hold that the evidence was legally sufficient for a rational trier of fact to reject
appellant's claim of self-defense and to find that appellant intentionally or knowingly
caused the death of the complainants by shooting them with a deadly weapon. See
Poindexter, 153 S.W.3d at 405.

 The evidence is also factually sufficient. The crux of appellant's argument in
the Villanueva killing was that Villanueva was the first aggressor, that appellant
feared him, and that appellant shot him because Villanueva was reaching for
appellant's gun. Although appellant and Diaz testified that Villanueva was
aggressive, cursed them, and struck appellant first, their testimony was contradicted
by Sisco and Reyes, who testified that appellant was the aggressor and that they had
never experienced any trouble with Villanueva or Pena. Although there was
conflicting testimony as to who was the first aggressor, Jimmy testified that the fight
between appellant and Villanueva had ended and that Villanueva was not a threat
when appellant shot him. Villanueva's autopsy confirmed that he was shot from at
least three feet away while he lay on his back after suffering one or more significant
blows to his head. Jimmy also testified that, in his opinion, appellant may have shot
Villanueva out of anger. Again, Erica further testified that after Jimmy broke up the
fight, everyone could have simply walked away and nobody had to die.

 With regard to Pena, the jury heard evidence that Pena was hurt and curled up
on the ground when appellant shot her. Jimmy told police that Pena was on the
ground, scooting backwards away from appellant in an attempt to get away from him
when he shot her. Pena's autopsy confirmed that she was lying on her left side with
her legs curled up against her torso, having suffered significant head trauma prior to
being shot. According to Erica, appellant could have done a "lot of things that night"
besides shooting Pena. 

 In addition to the above, when approached by police each of the people in
appellant's group either lied about what happened or were uncooperative in locating
appellant. Appellant himself concocted a lie to explain how his cell phone was found
at the crime scene. He tried to execute a plan to blame Anthony for the shooting, and
admitted to Jimmy that he had "already f**ked up" in killing Villanueva and did not
want to leave Pena as a witness. Erica testified that she, too, thought that appellant
might have killed Pena so Pena could not identify him to the police. 

 Because the evidence in this case is almost exclusively testimonial and is
sometimes contradictory, the outcome depends on whose testimony seems most
credible. See Cain, 958 S.W.2d at 407. The jury is the sole judge of the credibility
of the witnesses and the weight to be given the evidence; thus, the jury is entitled to
believe or disbelieve all or part of a witness's testimony. Jones v. State, 944 S.W.2d
642, 647-48 (Tex. Crim. App. 1996). The jury was free to reject appellant's evidence
that he was acting in self-defense and to accept the evidence to the contrary. See
Saxton v. State, 804 S.W.2d 910, 914 (Tex. Crim. App. 1991). Viewing the evidence
in a neutral light, we cannot say the evidence of guilt, considered by itself, is too
weak to support the finding of guilt beyond a reasonable doubt or that the contrary
evidence is strong enough that the beyond-a-reasonable-doubt standard could not
have been met. See Watson v. State, 204 S.W.3d 404, 416-17 (Tex. Crim. App. 2006). 
Therefore, we hold the evidence is factually sufficient to support the jury's finding
of guilt.

 We overrule appellant's first and second issues.

B. Improper Admission of Extraneous Offense Evidence

 In his third, fourth, and fifth points of error, appellant claims that the trial court
abused its discretion by allowing the trial prosecutor to question Erica and appellant
about his tendency to carry a gun, his reckless behavior with guns, and his tendency
to become angry. Appellant also urges that the trial court erred when it allowed the
State to introduce a photograph of appellant in possession of a gun on a date not
alleged in the indictment. 

 1. Testimony of Appellant's Common Law Wife (Appellant's Third
Point of Error)


 In furtherance of appellant's defense, appellant's common-law wife Erica
testified that appellant fought Villanueva with a sprained right hand because a week
earlier appellant had hit a window at work. Moreover, she testified that appellant's
left hand was missing its pinky finger and was wrapped in gauze. Erica also stated
that she knew that appellant was carrying a pistol when he went to the picnic table to
eat. 

 Erica testified that after appellant's struggle with Villanueva was over,
appellant proceeded to break up her fight with Pena. Erica ran away and saw Pena
reaching for appellant. Appellant shot Pena a couple of times and then continued
shooting her as he ran back to their vehicle. 

 On cross-examination, the State asked Erica several questions about appellant's
personality and tendency to become angry. The State also asked questions about
appellant's gun, but Erica stated that she had never seen it and did not know what
kind of gun it was. Erica later elaborated on appellant's prior injury, stating that
appellant got into an argument with her, got mad, and struck a car window. 
According to Erica, the remaining sprain was so bad that it hindered appellant's
ability to fight Villanueva. 

 The State asked more questions about appellant's gun and his behavior with
the gun:

 State: So, this gun that you don't know what it is, was that
just a one-night thing that he just carried it that night, or
did he carry it all the time?


 Defense: Judge, again, I would object to that as being a
violation of Rule 404 as to what was done in the past.


 Trial Court: Overruled.


 Erica: I'm sorry , can you repeat it?


 State: Was that just a one-night thing, or did he carry it all
the time?


 Erica: I'm pretty sure he carried it all the time. I don't
know. He wouldn't ask my permission to carry it.


 State: But you know when he carries it, don't you?


 Erica: Not all the time.


 State: Is it such a casual thing that when your husband is
carrying a gun around you don't know when he has it?


 Erica: No.


 State: But you know he carries it on a regular basis,
correct?


 Erica: Yes.


 State: Or does he just carry it when he goes out drinking
and partying with his friends?


 Erica: No.


 State: He carries it all the time?


 Erica: Yes.


 State: Does he have a license to carry that gun?


 Erica: No.


 State: And he doesn't just carry the gun, he plays with it a
lot, doesn't he?


 Erica: Yes.


 State: And, in fact, there have been many times outside
that apartment complex right there in the middle of the
parking lot where he pulls out that gun and shoots it off in
the air?


 Defense: Judge, I object to this line of questioning as
being an extraneous offense, extraneous matter that's not
material.


 Trial Court: Overruled.


 Erica: Can you repeat the question?


 State: There have been lots of times when he goes out in
that parking lot at that apartment complex and shoots off
that gun?


 Defense: Can I have a running objection to this line of
questioning?


 Trial court: Yes.


 Defense: Thank you.


 Trial court: What was your answer?


 Erica: No.


 State: Are you saying that's never happened?


 Erica: Not to my knowledge, no.


 State: Are you saying he's never gone out there and shot
off that gun?


 Erica: No.


 State: You don't remember an occasion about a month
before this incident where you and the defendant and
Jimmy and Shelly all stood out in that parking lot and shot
off the gun and the neighbors called the police?


 Defense: Again, I object to this line of questioning.


 Trial Court: Overruled.


 Erica: No, I don't recall.


 State: That's his gun, isn't it?


 Erica: Yes.


 State: Nobody else has that gun, do they?


 Erica: No.


 State: So, would it surprise you to learn that casings from that gun were
collected and found-


 Defense: Judge, assuming facts not in evidence.


 Trial Court: Sustained.


 State: Isn't that exactly what he was doing the night that he shot half his
pinky finger off?


 Erica: Yes.


 State: He was playing with that gun out there in that apartment complex
parking lot, wasn't he?


 Erica: No.


 State: Where was he playing with the gun?


 Erica: I don't remember. I know it wasn't in the apartments though.


 State: You don't remember where your husband shot off half his pinky
finger?


 Erica: It was not at my apartments.


 State: Do you remember where it was?


 Erica: At his uncle's.


 State: At his uncle's apartments?


 Erica: At his uncle's house.


 State: At his uncle's house. In the house or outside?


 Erica: Outside.


 State: What was he doing with it?


 Erica: I'm not sure. I wasn't-my back was to him.


 State: You were there and he was playing with it, wasn't he?


 Erica: Uh-huh.


 State: Shooting it and messing around with it?


 Erica: Not shooting it.


 State: Do you notice his personality is different when he's running
around with that gun or is he just always mean?


 Defense: Judge, I- 


 Trial Court: Sustained to the form of the question.


 Defense: I'd ask the Court to admonish the jury not to consider that last-

 

 Trial Court: You will disregard the last question and not consider it for
any purpose.


 Defense: I'll ask for a mistrial.


 Trial Court: Be denied.


 State: Is your husband left-handed or right-handed?


 Erica: My husband is left-handed.


 2. Testimony of Appellant (Appellant's Fourth Point of Error)

 

 Appellant testified next. He stated that he bought the 9-millimeter pistol
legally at a gun show. He also stated that two injuries impeded his ability to fight
Villanueva: (1) his right wrist was sprained from an argument with Erica, and (2)
shortly before the incident he had shot off his left pinky finger. On cross-examination, appellant stated that he had the 9-millimeter Ruger for a couple of
months and that he had two 15-round clips and a 30-round clip for it.

 Over his attorney's objection, the State asked if appellant had been outside his
apartment complex on a number of occasions shooting off the gun and scaring his
neighbors; appellant stated that he had not. Also following his attorney's "assuming
facts not in evidence" objection, the State asked if anyone had "gathered up those
casings and submitted them to the police." Appellant responded, "I don't know
nothing about that." Finally, over appellant's Rule 403 objection, the State asked
when he carried the gun. Appellant stated, "I just-whenever, really. I don't have no
certain days that I decide I'm going to carry it or nothing like that." With regard to
the night in question, appellant stated, "[e]verybody else had a gun, so I had brought
mine." 

 3. Photographic Evidence (Appellant's Fifth Point of Error)

 The State was also allowed to introduce a photograph of appellant smiling,
surrounded by friends, while holding a handgun at a firing range on a date not alleged
in the indictment. Appellant objected that the photo was irrelevant, immaterial, and
that the prejudicial effect of the photograph outweighed any probative value, but the
objection was overruled. At trial, crime scene officer Duncan testified that he
recovered a cell phone from the Poppa Burger restaurant. During Duncan's
testimony, the State entered the cellular phone into evidence and appellant reserved
his right to object to the admission of photographs found inside the phone. One of
the photographs inside the phone was the photograph of appellant at the firing range
with the gun.

 The State introduced the photograph into evidence over appellant's Rule 402
and 403 objections, which the trial court denied. Jimmy testified that he thought that
the gun appellant was holding in the photograph was a 9-millimeter Ruger handgun. 
Jimmy also stated the gun in the photograph may have belonged to someone else. 


 4. Analysis

 Appellant complains that the trial court erred by overruling his Rule 404 and
Rule 403 objections to the testimony and photograph outlined above. We review a
trial court's decision to admit evidence under an abuse of discretion standard. Moses
v. State, 105 S.W.3d 622, 627 (Tex. Crim. App. 2003). The trial court does not abuse
its discretion unless its determination lies outside the zone of reasonable
disagreement. Montgomery v. State, 810 S.W.2d 372, 391 (Tex. Crim. App. 1991).

 a. Relevancy

 At trial, all relevant evidence is admissible unless otherwise excepted by the
Constitution, statute, or other rules. Tex. R. Evid. 402. Evidence is relevant if it has
any tendency to make more probable or less probable the existence of a consequential
fact. See Tex. R. Evid. 401; Moses, 105 S.W.3d at 626. Not all relevant evidence is
admissible. Id. 

 Evidence of other crimes, wrongs or acts is not admissible to prove the
character of a person in order to show action in conformity therewith. It may,
however, be admissible for other purposes, such as proof of motive, opportunity,
intent, preparation, plan, knowledge, identity, or absence of mistake or accident,
provided that upon timely request by the accused in a criminal case, reasonable notice
is given in advance of trial of the intent to introduce within the State's case-in-chief
such evidence other than that arising in the same transaction. Tex. R. Evid. 404(b). 
In other words, evidence is admissible under Texas Rule of Evidence 404(b) if it is
relevant to show a non-character purpose that in turn tends to show commission of
the crime. See Tibbs v. State, 125 S.W.3d 84, 89 (Tex. App.--Houston [14th Dist.]
2003, pet. ref'd.). 

 Additionally, extraneous offense evidence may be relevant and admissible to
rebut a defensive theory, such as self-defense. See Montgomery, 810 S.W.2d at
387-88. The State, as the proponent of extraneous offense evidence, bears the burden
of showing admissibility. See Rankin v. State, 974 S.W.2d 707, 718 (Tex. Crim. App.
1998).

 As previously noted, appellant complains that the aforementioned testimony
and photograph are irrelevant. In support of admission, the State cites section
9.31(b)(5) of the Texas Penal Code. That portion of the self-defense statute provides,
"the use of force against another is not justified . . . if the actor sought an explanation
from or discussion with the other person concerning the actor's differences with the
other person while the actor was carrying a weapon in violation of section 46.02." 
Tex. Pen. Code Ann. § 9.31(b)(5) (Vernon Supp. 2007). Section 46.02 of the Texas
Penal Code prohibits the unlawful carrying of a firearm. Tex. Pen. Code Ann. §
46.02 (Vernon Supp. 2007).

 Because appellant claimed self-defense against both complainants, we agree
with the State that appellant's experience with firearms prior to the shootings is
relevant to rebut appellant's defensive theory. The testimony speaks to appellant's
lack of maturity and good judgment in the handling of his weapon, to the frequency
with which he used the weapon, and is relevant to show absence of mistake or
accident with regard to the complainants' deaths. Likewise, the photograph of
appellant at the firing range is also relevant to provide a link between appellant, the
cellular phone, and the 9-millimeter Ruger handgun that was used in the shooting, but
was never recovered by police. (3) Consequently, the trial judge did not abuse his
discretion in by admitting the testimony and photograph over appellant's Rule 404(b)
objection.

 b. Prejudice

 Appellant contends that, even if the testimony and photograph were relevant,
they should have been excluded because their probative value was substantially
outweighed by the danger of unfair prejudice. See Tex. R. Evid. 403. As the Court
of Criminal Appeals has noted, to violate Rule 403, it is not enough that the evidence
is "prejudicial"--it must be unfairly prejudicial. Vasquez v. State, 67 S.W.3d 229,
240 (Tex. Crim. App. 2002). Unfair prejudice occurs when the evidence has "an
undue tendency to suggest decision on an improper basis, commonly, though not
necessarily, an emotional one." Id. 

 In making a determination under Rule 403, we take into account several
factors: (1) how compelling the evidence serves to make more or less probable a fact
of consequence; (2) the potential of the genre of evidence to impress the jury in some
irrational but nevertheless indelible way; (3) how much trial time is consumed; and
(4) how great the proponent's need is for this evidence. Montgomery, 810 S.W.2d at
389-90; Hernandez v. State, 891 S.W.2d 744, 748 (Tex. App.--Fort Worth 1994, pet.
ref'd). Considering these factors, the trial court did not err in finding that this
potential character conformity inference does not substantially outweigh the relevant
purpose of showing motive for the aggravated sexual assault. See Vasquez, 67
S.W.3d at 240. 

 First, as previously noted, evidence of appellant's experience with the gun and
practice of carrying it without a license serves to make less probable a fact of
consequence, namely that appellant acted in self-defense. Appellant's disregard for
handgun safety and registration laws is evidence consistent with the State's theory
that appellant intentionally brandished the weapon and caused the death of the
complainants. Second, the record does not support the notion that the evidence
tended to impress the jury in some irrational and indelible manner, nor does appellant
explain any such impact in his brief. Third, the evidence of appellant's experience
with the gun was developed quickly via a single photograph and through a limited
series of questions directed at Erica, Jimmy, and appellant. Therefore, the record
does not indicate a disproportionate amount of time was spent on this subject. Fourth,
the evidence was significant to the State's case as it served to rebut appellant's theory
of self-defense. Thus, the State had a compelling reason to present such evidence.

 In light of the relevancy of the evidence and our analysis under Rule 403, we
hold the trial court's determination to admit the testimony and photograph does not
fall outside of the zone of reasonable disagreement. See Weatherred, 15 S.W.3d at
542. Therefore, we overrule appellant's third, fourth, and fifth issues. 

 C. Failure to Declare a Mistrial

 In his sixth point of error, appellant contends the trial court also abused its
discretion by denying appellant's mistrial request following the prosecutor's question
to Erica asking whether appellant's "personality is different when he's running
around with that gun or is he just always mean?" 

 We review the denial of a motion for mistrial under an abuse-of-discretion
standard. Hawkins v. State, 135 S.W.3d 72, 76-77 (Tex. Crim. App. 2004); Davis v.
State, 177 S.W.3d 355, 363 (Tex. App.--Houston [1st Dist.] 2005, no pet.). Under
this standard, an appellate court must uphold the trial court's ruling as long as the
ruling was within the zone of reasonable disagreement. Wead v. State, 129 S.W.3d
126, 129 (Tex. Crim. App. 2004).
 "A mistrial is a device used to halt trial proceedings when error is so prejudicial
that expenditure of further time and expense would be wasteful and futile." Wood v.
State, 18 S.W.3d 642, 648 (Tex. Crim. App. 2000) (quoting Ladd v. State, 3 S.W.3d
547, 567 (Tex. Crim. App. 1999)). It is appropriate only for "a narrow class of highly
prejudicial and incurable errors." Id.; See Hawkins, 135 S.W.3d at 77. Thus, a trial
court properly exercises its discretion to declare a mistrial when, due to the error, an
impartial verdict cannot be reached or a conviction would have to be reversed on
appeal due to "an obvious procedural error." Wood, 18 S.W.3d at 648.

 When, as here, the trial court sustains an objection and instructs the jury to
disregard, but denies a defendant's motion for a mistrial, the issue is whether the trial
court abused its discretion in denying a mistrial. Hawkins, 135 S.W.3d at 77. In
determining whether the trial court abused its discretion in denying the mistrial, we
balance three factors: (1) the severity of the misconduct (prejudicial effect), (2)
curative measures, and (3) the certainty of conviction absent the misconduct. Id. at
75. Only in extreme circumstances, when the prejudice is incurable or the comment
is "so prejudicial that expenditure of further time and expense would be wasteful and
futile," will a mistrial be required. Id.

 We agree with appellant that the trial prosecutor's question was improper, but
conclude that the trial court did not abuse its discretion in failing to declare a mistrial. 
The improper question was an isolated one, and the trial court quickly instructed the
jury to disregard the argument. We presume that the trial court's instruction to
disregard the prosecutor's comment was followed by the jurors. See Wesbrook v.
State, 29 S.W.3d 103, 116 (Tex. Crim. App. 2000). Due to the absence of any
evidence in the record rebutting this presumption and the absence of any harm, we
cannot say the trial court abused its discretion in denying appellant's mistrial motion.

 Appellant's sixth issue is overruled.

 D. Failure to Allow Toxicology Reports Concerning Complainant's Bodies

 In his seventh point of error, appellant contends the trial court abused its
discretion in failing to admit certain toxicology evidence concerning the
complainants. Appellant urges that the evidence was relevant, that its admission was
supported by article 38.36 of the Texas Code of Criminal Procedure, and that its
exclusion violated his federal constitutional right to present a meaningful defense.

 The State called Dr. Mary Anzalone in the presence of the jury to testify about
the complainant's autopsy results. The autopsy reports were admitted into evidence,
but did not contain any toxicology test results. Appellant attempted to introduce the
toxicology reports following Dr. Anzalone's testimony and argued that he should be
able to cross-examine Dr. Anzalone about the toxicology reports because they were
relevant to support testimony that Villanueva was the first aggressor. The trial court
initially ruled that, at that point in the trial, no evidentiary link existed between the
toxicology results and appellant's self-defense claim. The trial court stated that,
should the toxicology reports become relevant, then it would allow appellant to
discuss the information in the reports. 

 Through subsequent testimony, appellant attempted to establish that the
complainants were intoxicated and that their impaired state placed appellant in fear
for his safety. Appellant testified that Villanueva was mad, cursing them, and calling
them names. He stated that Villanueva's eyes looked red, that Villanueva appeared
to have been drinking, and that Pena looked like she had been "drinking or doing
whatever [Villanueva] had been doing." Appellant told the jury that he feared
Villanueva because of a teardrop tattoo on Villanueva's face and that Villanueva was
the first aggressor, hitting appellant in the face. He testified further that Villanueva
was strong and that they struggled over appellant's gun. Appellant concluded that he
shot Villanueva as soon as Jimmy separated the two because he was afraid and had
no other choice. 

 Following appellant's testimony, appellant's attorney again sought to introduce
the toxicology reports. Appellant made a proffer of evidence by calling Dr. Anzalone
to testify outside of the jury's presence. Dr. Anzalone's testimony revealed that
several illicit drugs were present in both complainants' systems and that ethyl alcohol
was present in Villanueva's system. Dr. Anzalone testified that she could not say
whether the presence of such drugs would make it more or less likely that someone
would act in an aggressive manner. Appellant reurged the admission of the
toxicology results on the basis that they were probative in light of Villanueva's
aggressive conduct, they represented a pertinent character trait of the victim under
Rule 404(a)(2), and that their exclusion violated appellant's right to present a
complete defense. The trial court found that the evidence was relevant, but that its
prejudice highly outweighed any probative value, which was only speculative.

 1. Appellant's Sixth Amendment Claim

 Appellant argues that the trial court's refusal to admit the toxicology results
violates his Sixth Amendment right to present a meaningful defense. In support of his
argument, appellant cites the Supreme Court's recent opinion in Holmes v. South
Carolina, 547 U.S. 319, 126 S. Ct. 1727 (2006). There, the court held
unconstitutional a state rule that controlled the admissibility of certain evidence at a
criminal trial. Holmes, 547 U.S. at 331, 126 S. Ct. at 1735. Holmes was tried for the
beating, rape, and robbery of an 86-year-old woman. Id. at 321, 126 S. Ct. at 1730. 
The State presented evidence that Holmes had been seen near the woman's home
within an hour of the attack, along with forensic evidence linking him to the crime to
a very high degree of certainty. Id. at 322, 126 S.Ct. at 1730. In his defense, Holmes
sought to introduce evidence that the forensic evidence had been contaminated, that
the police and prosecutors were trying to frame him, and that a third party committed
the crime. Id. at 322-23, 126 S.Ct. at 1730.

 The trial court excluded Holmes' evidence pursuant to a state rule that allowed
evidence of a third party's guilt if it "'raise[s] a reasonable inference or presumption
as to [the defendant's] own innocence,'" but not if it merely "cast[s] a bare suspicion
upon another'" or "'raise[s] a conjectural inference as to the commission of the crime
by another.'" Id. at 323-24, 126 S. Ct. at 1731. 

 Upon review, the United States Supreme Court found the evidentiary rule
"arbitrary" and unconstitutional as applied because it did not rationally serve the end
it was designed to promote--focusing the trial on central issues by excluding
evidence that had only a very weak logical connection to them. Id. at 329-30, 126
S. Ct. at 1734-35. The Court determined that the constitutional right to a
"meaningful opportunity to present a complete defense" prohibits basing the
admissibility of potentially exculpatory evidence on the strength of only one party's
evidence, especially where the "strength" of that evidence calls for a credibility
assessment historically left to the jury. Id.

 In Texas, the improper exclusion of evidence may raise a constitutional
violation in two circumstances: (1) when an evidentiary rule categorically and
arbitrarily prohibits the defendant from offering relevant evidence that is vital to his
defense, or (2) when a trial court erroneously excludes evidence that is a vital portion
of the case and the exclusion effectively precludes the defendant from presenting a
defense. Ray v. State, 178 S.W.3d 833, 835 (Tex. Crim. App. 2005) (citing Potier v.
State, 68 S.W.3d 657, 659-62 (Tex. Crim. App. 2002)). 

 We are not persuaded by appellant's reliance on Holmes. In contrast to that
case, which involved a specific state statute, the trial court here weighed the probative
value of the evidence against the danger of unfair prejudice or confusion of the issues
in accordance with the Texas Rules of Evidence. See Tex. R. Evid. 403. First, Dr.
Anzalone testified that she could not speak to whether the toxicology results showed
either complainant was behaving aggressively on the night of the shooting. 
Therefore, the probative value of this evidence was minimal. Second, the trial court's
ruling did not effectively preclude appellant from presenting a defense with regard
to this issue because appellant offered testimony from numerous eyewitnesses, as well
as his own opinion, that both complainants were intoxicated. Consequently, the trial
court's ruling was not arbitrary or unconstitutional and appellant was not denied his
Sixth Amendment right to present a meaningful defense.

 2. Appellant's Claim Under Rules 106 and 107 of the Texas Rules of Evidence


 Next, appellant urges this court to find the trial court abused its discretion in
denying the toxicology reports because they were part of the larger autopsy reports
that should have been admitted pursuant to Rules 106 and 107 of the Texas Rules of
Evidence. To preserve a complaint for appellant review requires a party to raise a
timely, specific objection at trial and to obtain an adverse ruling. Tex. R. App. P.
33.1(a). Failure to do so waives any complaint on appeal. Id. Appellant did not urge
these bases for the admission of the toxicology reports at trial and, therefore, has not
preserved the arguments for our review.

 3. Appellant's claim under Article 38.36, Texas Code of Criminal Procedure


 Finally, appellant argues that the trial court erred in refusing to admit the
toxicology reports under article 38.36 of the Texas Code of Criminal Procedure. See 
Tex. Code Crim. Proc. Ann. art. 38.36 (Vernon 2005). Article 38.36(a) provides
that "in all prosecutions for murder, the state or the defendant shall be permitted to
offer testimony as to all relevant facts and circumstances surrounding the killing and
the previous relationship existing between the accused and the deceased, together
with all relevant facts and circumstances going to show the condition of the mind of
the accused at the time of the offense." Although the statute refers to "murder"
prosecutions, it has historically been applied to capital murder proceedings as well. 
See Lamb v. State, 680 S.W.2d 11, 16-17 (Tex. Crim. App. 1984).

 In support of his argument that the trial court abused its discretion in failing to
admit the reports, appellant cites Turner v. State, 762 S.W.2d 705 (Tex.
App.--Houston [14th Dist.] 1988, pet. ref'd). In that case, the Fourteenth Court of
Appeals considered whether the trial court erred by refusing to allow a defendant to
present evidence about the alcohol and drug usage of the deceased and a witness prior
to the date on which the murder occurred. Id. at 707. The Court cited the statute's
predecessor and found that "[t]he only relevant inquiry is whether the deceased and/or
[the witness] were under the influence of drugs at the time of the murder or whether
the use of drugs had any connection to the commission of the crime itself." Id. at 708. 
Based on this language, appellant concludes that the toxicology reports were
therefore admissible because they show that the complainants were under the
influence of drugs and alcohol when they were killed.

 We agree with appellant that because the reports reflected the "facts and
circumstances surrounding the killing" they were admissible under article 38.36. 
However, the reports were still subject to a balancing test pursuant to Rule 403. See
Smith v. State, 5 S.W.3d 673, 679 (Tex. Crim. App. 1999) (holding article 38.36 does
not abrogate trial court's duty to comply with rule excluding relevant evidence if its
probative value is outweighed by its prejudicial effect). The trial court conducted
such a balancing test and found the probative value of the evidence did not outweigh
the danger of unfair prejudice or confusion of the issues. See Tex. R. Evid. 403. 
Appellant does not address the trial court's Rule 403 analysis in his appellate brief. 
Accordingly, we cannot say the trial court abused its discretion in denying the
admission of the reports into evidence. 

 Moreover, even if we assume the trial court erred in excluding the toxicology
reports, the error was harmless. As a general rule, error in the admission or exclusion
of evidence does not rise to a constitutional level. Bagheri v. State, 119 S.W.3d 755,
762-63 (Tex. Crim. App. 2003). In this case, because the trial court ultimately found
the evidence relevant, but excluded it under Rule 403, any alleged error would be in
the exclusion of evidence in violation of the Texas Rules of Evidence. Thus, we
apply the harmless error standard found in Texas Rule of Appellate Procedure
44.2(b). 

 Rule 44.2(b) of the Texas Rules of Appellant Procedure provides that any non-constitutional error that does not affect substantial rights must be disregarded. Tex.
R. App. P. 44.2(b). In conducting the harm analysis, an appellant court should
consider everything in the record, including any testimony or physical evidence
admitted for the jury's consideration, the trial court's instructions to the jury, the
State's theory, any defensive theories, closing arguments, and even voir dire if
material to the appellant's claim. Motilla v. State, 78 S.W.3d 352, 355-56 (Tex.
Crim. App. 2002). In assessing harm, factors to be considered include the nature of
the evidence supporting the verdict, the character of the alleged error, and how the
evidence might be considered in connection with the other evidence in the case. 
Motilla, 78 S.W.3d at 355-56. The weight of the evidence of appellant's guilt is also
relevant in conducting the harm analysis under Rule 44.2(b). Id. at 357.

 In determining the magnitude of the harm resulting from the exclusion of the
toxicology reports, we have examined and considered the entire record. To begin,
during appellant's proffer, Dr. Anzalone testified that the toxicology results did not
reveal a chemical combination in complainants' bodies that would have necessarily
made complainants behave aggressively on the night of the shooting. Moreover, even
without the offered toxicology reports, the defense was able to present evidence that
both complainants appeared drunk or high the night of the shootings. Specifically,
appellant told the jury that Villanueva appeared to be intoxicated and that his eyes
were "real red." Jimmy testified that Villanueva looked like he was "high" and that
Pena was "acting crazy." Erica also testified that she thought Villanueva and Pena
had been drinking. In addition, during closing arguments, appellant's attorney noted
that appellant was fearful of Villanueva because of his intoxicated state. 

 Upon reviewing the entire record, we therefore conclude the trial court's error,
if any, did not have a substantial and injurious effect or influence on the jury's
verdict.

 We overrule appellant's seventh issue.

 E. Failure to Allow the Introduction of Autopsy Photographs of Villanueva


 In his eighth point of error, appellant claims the trial court erred in excluding
from evidence certain photographs of Villanueva taken in connection with the
autopsy. At trial, appellant urged the introduction of these photographs into evidence
under the rule of optional completeness since they were made during the autopsy
process. The State objected that the photographs, which depicted numerous tattoos
on Villanueva's body, were irrelevant and should not be admitted into evidence. 
Appellant's attorney argued that they were relevant to generally inform the jury
"about what Mr. Villanueva looked like and what kind of person he was . . . ." The
trial court denied appellant's request.

 In his brief, appellant argues that the photographs should have been allowed
into evidence under Rules 106 (Remainders of or Related Writings or Recorded
Statements) and Rule 107 (Rule of Optional Completeness) of the Texas Rules of
Evidence. As to Rule 106, appellant raises this ground of error for the first time on
appeal, therefore we hold the issue was not properly preserved for our review. See
Tex. R. App. P 33.1(a).

 Rule 107 of the Texas Rules of Evidence, sometimes referred to as the Rule of
Optional Completeness, provides that, "[w]hen part of an act, declaration,
conversation, writing or recorded statement is given in evidence by one party, the
whole on the same subject may be inquired into by the other." Tex. R. Evid. 107.
The purpose of the rule is to reduce the possibility that the fact-finder receives a false
impression from having heard only part of some act, conversation, or writing.
Credille v. State, 925 S.W.2d 112, 116 (Tex. App.--Houston [14th Dist.] 1996, pet.
ref'd.)

 Appellant's brief does not explain how Rule 107 operates in furtherance of
the admission of the autopsy photographs. Therefore, we hold this point is
inadequately briefed and presents nothing for our review. See Tex. R. App. P. 38.1;
Rocha v. State, 16 S.W.3d 1, 20 (Tex. Crim. App. 2000). Appellant's eighth issue is
overruled.

 F. Error in Excluding Testimony Concerning Villanueva's Teardrop Tattoo


 In his ninth point of error, appellant argues that the trial court erred in
excluding testimony concerning a teardrop tattoo appellant saw on Villanueva's face
the night of the killing. Appellant argues that the evidence should have been admitted
under article 38.36 of the Texas Code of Criminal Procedure and that the evidence
was necessary for him to present a complete defense as guaranteed by the Sixth
Amendment. 

 While cross-examining Lisa Hinojosa, appellant's attorney introduced two
photographs into evidence showing images of Villanueva's face and left eye. Later,
appellant's attorney showed the photographs to Jimmy and wanted Jimmy to identify
a faint blemish next to Villanueva's left eye as a teardrop tattoo and to ask Jimmy
what such a tattoo meant to him. The trial court did not allow the testimony. Jimmy
later testified that appellant told him he shot Villanueva because he feared that
Villanueva was going to take the gun away and shoot appellant with it. When Jimmy
finished testifying, appellant's attorney told the court that he intended to make a
proffer of Jimmy's testimony about the tattoo the following day. The record reveals
that the intended proffer was never made. 

 On direct examination, both appellant and Erica testified that Villanueva had 
a tattoo on his face. Appellant's attorney sought to ask appellant the following:

 Appellant's Attorney: Based upon your experience with tattoos, what did that tattoo mean to you?


 State: I'll object to the relevance.


 Trial Court: Y'all come up.


 (At the bench, on the record.)

 

 Trial Court: I guess I should have asked during our last
evening together, but what's he going to say?


 Appellant's Attorney: He is going to say that he's under
the impression that he had either killed somebody or-


 Trial Court: Or what?


 Appellant's Attorney: Or the tattoo represents some group that he was in-killed somebody and that made him fearful of him.


 Trial Court: I have never heard of a tattoo-I mean, really and truly I
have never heard the teardrop tattoos mean anything but either my
homeboy died in the penetentiary or friends of mine that have died. I
have never heard it said that-


 Appellant's Attorney: Judge, I have heard a lot of people say tattoos mean-each teardrop counts for a person I have killed. That's been the reputation for years.


 Trial court: Never heard that.


 Appellant's Attorney: I have.


 Trial court: Here's the deal. That version of it is way over the top
prejudicial.


 Appellant's Attorney: I'll just make a bill.

 

 Trial Court: I'll tell you what. You can say he had a tattoo and it was
on his face and because of what I know about tattoos it made me fearful
of him, but the other, no.


 (Open court, defendant and jury present).


 Appellant's Attorney: Once you saw the tattoo, from what you know
about tattoos, did that tattoo make you fearful of him.


 Appellant: Yes. I knew what it meant.


 Appellant's Attorney: Don't go into what you knew about it.


 Trial Court: Just "yes" or "no".


 Appellant: Yes.

 

 For the first time on appeal, appellant relies on article 38.36 as support for the
admissibility of the evidence regarding the meaning of Villanueva's tattoo. Also for
the first time on appeal, appellant contends the trial court's failure to allow evidence
as to the meaning of the tattoo denied appellant his Sixth Amendment right to present
a complete defense. 

 Again, to preserve a complaint for appellant review, a party must make a
timely, specific objection in the trial court. Tex. R. App. P. 33.1(a). A failure to
timely and specifically object waives even constitutional rights. Muniz v. State, 851
S.W.2d 238, 255 (Tex. Crim. App. 1993).

 In the instant case, appellant failed to articulate the basis for his objection to
the trial court's failure to admit evidence concerning the purported meaning of
Villanueva's tattoo. Additionally, appellant failed to make his intended proffer. 
Therefore, appellant has waived this claim's review. See Muniz, 851 S.W.2d at 255
(holding "except for complaints involving systemic (or absolute) requirements, or
rights that are waivable only . . . all other complaints, whether constitutional, statutory
or otherwise are forfeited by failure to comply with Rule 33.1(a).")

 Appellant's ninth issue is overruled.

 G. Request for "Sudden Passion" Instruction


 In his tenth point of error, appellant argues that the trial court erred in denying
appellant's request for a "sudden passion" instruction in the guilt-innocence jury
charge. Texas's current scheme does not allow juries to consider "sudden passion"
in capital murder cases in which the State does not seek the death penalty, but allows
juries to consider the defense in the punishment phase of murder cases. See Tex.
Pen. Code Ann. §§ 19.02(b)-(d), 19.03. Appellant argues that affording murder
defendants the benefit of the defense of "sudden passion," but not affording the same
defense to capital murder defendants violates his right to Equal Protection and to Due
Process under the Fourteenth Amendment, as well as his right to be free from cruel
and unusual punishment under the Eighth Amendment.

 The Court of Criminal Appeals previously addressed this argument in
Wesbrook v. State, 29 S.W.3d 103, 112 (Tex. Crim. App. 2000). There, the Court
recognized "the Legislature, through its broad power to classify crimes and those who
stand accused of crimes, chose not to permit the defense of 'sudden passion' in the
context of capital murder. Id. at 113. No equal protection concerns are present as a
result of the Legislatures prerogative to treat capital murder defendants differently
from other murder defendants in this manner." Id. 

 As an intermediate appellate court, we must follow binding precedent of the
Court of Criminal Appeals. McKinney v. State, 177 S.W.3d 186, 192 (Tex.
App.--Houston [1st Dist.] 2005), aff'd, 207 S.W.3d 366 (Tex. Crim. App. 2006). 
Appellant fails to explain how the law has changed since Wesbrook or why this court
should deviate from precedent.

 Appellant's tenth issue is overruled.

 H. "Right to Continue Shooting" Request


 In his eleventh point of error, appellant argues that the trial court erred in
denying appellant's requested instruction on his "right to continue" shooting until the
danger had ended. Appellant's requested charge read:

 You are instructed, in connection with the right of self-defense, that if
the defendant was acting in self-defense when he shot at the deceased,
then he would have a right to continue firing his firearm at the deceased
so long as it reasonably appeared to him, at the time, as viewed from his
standpoint alone, that all danger had not passed.

 We conclude the trial court did not err in denying the requested instruction. 
Although a party was previously entitled to an instruction on the right to shoot and
continue to shoot until the danger had passed when the evidence showed appellant
was in continuing danger, the Texas Penal Code changed in 1974, requiring "the actor
to protect himself by retreating if it was reasonable to do so, i.e., the penal code
required a person to retreat before using deadly force if an ordinary person in the
actor's situation would have done so." See Philen v. State, 683 S.W.2d 440, 445
(Tex. Crim. App. 1984). This abolished the need for an instruction on the "right to
continue to shoot until the danger had ended." Id. Therefore, appellant was not
entitled to the instruction, and the judge did not err.

 Appellant's eleventh issue is overruled. I. Improper Jury Argument Concerning the Application of the Law
 of Self-Defense


 In his twelfth point of error, appellant argues that the trial court erred when it
overruled appellant's objection to the prosecutor's argument concerning the
application of the law of self-defense. Specifically, appellant urges that the the trial
court abused its discretion in overruling appellant's objection to the trial prosecutor's
jury argument that the circumstances of the Pena killing shed light on the Villanueva
killing. 

 During the State's jury argument the prosecutor, while addressing the issue of
the lesser-included offense of murder, stated:

 . . . So, they have conceded that Modesta Pena was not killed in self-defense.

 So, the only way you can find him guilty of murder instead of capital
murder is to believe that Rudy Villanueva was killed in self-defense. 
Well, there are a ton of reasons why that's not the case. And I will try
to think of as many as I can, but y'all are going to have your own list
back there yourselves. But one of the things you can look at is you can
look at how coldly and calculatedly he killed Modesta. And that will
instruct you on the truth of his version of events with regard to Rudy.

 

 Appellant objected to the argument, stating that it misstated the jury charge. 
The trial court instructed the jury that "This is argument, ladies and gentlemen. You
will refer to the charge for the law. This is argument of counsel." The prosecutor
continued:

 When you think about what happened to Rudy, you can be instructed by
the kind of person you know him to be based on what he did to Modesta. 
That's taking into account all the facts and circumstances. The kind of
person that walked over to Modesta Pena and shot her eight times while
she was cowering on the ground is the same kind of person who shot
Rudy Villanueva. So, you have a little insight into the character and the
coldness of his character that you might not have in other cases. Don't
forget what happened to Modesta when you consider what he did to
Rudy.

 There are at least four areas of proper jury argument: (1) summation of the
evidence, (2) reasonable deductions from the evidence, (3) responses to opposing
counsel's argument, and (4) pleas for law enforcement. See Perry v. State, 977
S.W.2d 847, 850 (Tex. App.--Houston [14th Dist.] 1998, no pet.). An attorney may
not inject speculative evidence outside the record in his or her jury argument. See
Everett v. State, 707 S.W.2d 638, 640-41 (Tex. Crim. App. 1986). However,
attorneys may draw all reasonable, fair, and legitimate inferences from the facts in
evidence. See Williams v. State, 688 S.W.2d 486, 491 (Tex. Crim. App. 1985). 
Additionally, even aggressive arguments are permissible so long as the arguments fall
within one of the four areas of proper jury argument. See Berry v. State, 233 S.W.3d
847, 860 (Tex. Crim. App. 2007).

 Appellant urges this court to find the prosecutor's argument improper because 
"whether . . . Pena was killed without justification has no bearing on whether
Villanueva was killed in self-defense." However, we disagree. Because part of
appellant's defense was that he killed Pena under a distressed state of mind brought
about by Villanueva's conduct, the State was entitled to respond that appellant killed
Pena in cold blood. Thus, the prosecutor's argument fell into the first, second, and
third categories of permissible jury argument.

 Appellant's twelfth issue is overruled.

 J. Improper Jury Argument; Failure to Comport with Jury Charge


 Finally, in his thirteenth point of error, appellant argues the trial court erred
when it overruled appellant's objection to the prosecutor's jury argument about how
the jury was to evaluate appellant's self-defense claim. Appellant complains of the
following portion of the State's argument:

 . . . One thing, before I leave it, though, the defense makes much about
your requirements to put yourself in the shoes of the defendant and asks
you to make yourself into a rash, angry 20-year-old man. That's not
what the law requires you to do.


 In fact, it tells you in the jury instructions: You are to look at the facts
as a reasonable person in the defendant's circumstances. Not as the
defendant in the defendant's circumstances.


 Appellant's attorney objected and was overruled by the trial judge, who
instructed the jury that "This is argument of counsel. The law is in the Court's
charge." The prosecutor continued:

 And what it says on page seven is you should place yourselves in the
defendant's position to determine how to view the facts. You, as 12
reasonable persons in that situation. Would two people have been dead
when you walked away? I don't think so.


 Appellant claims that the prosecutor argued an improper legal standard,
unsupported by the jury charge, and that the judge should have sustained his
objection. He argues that the trial prosecutor invited the jury to evaluate the evidence
based on their own personal viewpoints rather than based on how a reasonable person
would have evaluated them in the defendant's position. 

 The jury charge instructed the jury on the law concerning deadly force in self-defense. The charge informed the jury that an actor claiming deadly force in self-defense must reasonably believe that such force was immediately necessary to protect
himself against the other person's use or attempted use of unlawful deadly force, and
that a reasonable person in the defendant's situation would not have retreated. The
charge defined "reasonable belief" as "a belief that would be held by an ordinary and
prudent person in the same circumstances as the defendant." The charge instructed
that the actor must have acted upon a reasonable apprehension of danger, as it
appeared to him from his standpoint at the time, and that he must reasonably have
believed that the deadly force was immediately necessary. Further, it provided:

 [i]n determining the existence of real or apparent danger, you should
consider all the facts and circumstances in this case in evidence before
you, together with all relevant facts and circumstances going to show the
condition of the mind of the defendant at the time of the occurrence in
question, and in considering such circumstances, you should place
yourselves in the defendant's position at that time and view them from
his standpoint alone.


 After reviewing the prosecutor's closing argument and the jury charge, we find
that the State's comments on the law of self-defense comported with the jury
instruction and did not constitute impermissible argument. As the State correctly
notes in its brief, at the time appellant objected the prosecutor had done nothing more
than tell the jury to evaluate the facts not as the defendant but as a reasonable person
in his circumstances. This statement was a proper application of the law to the
evidence. Therefore, the trial court did not err by denying appellant's objection.

 We overrule appellant's thirteenth issue.


III. Conclusion


 We affirm the judgment of the trial court.




 Davie L. Wilson

 Justice

 

Panel consists of Justices Nuchia, Hanks, and Wilson. (4)


Do not publish. Tex. R. App. P. 47.2(b).



1. Actors are no longer required to retreat, if reasonable, for conduct occurring on or
after September 1, 2007. Act of Mar. 20, 2007, 80th Leg., R.S., ch. 1, §§ 2-3, 2007
Tex. Gen. Laws 1, 1-2 (amended 2007) (current version at Tex. Pen. Code Ann. §
9.31, 9.32 (Vernon Supp. 2007)). However, appellant's conduct occurred prior to
September 1, 2007, therefore this change in law is not applicable to the instant case.
2. "Serious bodily injury" means "bodily injury that creates a substantial risk of death
or that causes death, serious permanent disfigurement, or protracted loss or
impairment of the function of any bodily member or organ." Tex. Pen. Code Ann.
§ 1.07(a)(46) (Vernon Supp. 2006). Although the evidence revealed that Pena was
swinging a chain at various times during the altercation, a crime scene officer testified
that the chain he recovered at the scene was not a "deadly weapon" because the
bicycle chain lacked sufficient mass to create enough energy to inflict a lethal blow. 
Moreover, the evidence showed that Pena was not swinging the chain at all when
appellant shot her.
3. Anthony testified that appellant shot complainants with a 9-millimeter Ruger
handgun. Jimmy confirmed that appellant used a 9-millimeter Ruger on the night he
shot the complainants. Jimmy testified further that he had seen appellant with the
Ruger on more than one occasion. 
4. The Honorable Davie L. Wilson, retired Justice, First Court of Appeals, participating
by assignment.